**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MANJIT SANGHA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CIVIL ACTION: 18-00131-KD-B** |
| | * | |
| **NAVIG8 SHIP MANAGEMENT PTE** | * | |
| **LTD.,** | * | |
| | * | |
| **Defendant.** | * | |

## ORDER

This matter is before the Court on Defendant's motion for summary judgment, (Docs. 53, 54), Plaintiff's response (Doc. 56), and Defendant's reply (Docs. 57, 58).

## I.    PROCEDURAL BACKGROUND

On March 20, 2018, Captain Manjit Sangha (Sangha) filed a complaint, based on general maritime jurisdiction, against Defendants Navig8 and Navig8 Group asserting causes of action for tortious interference with existing contract, defamation, tortious interference with current and prospective relations, and intentional infliction of emotional distress.  (Doc. 1). Sangha alleged that Defendants made false, misleading, and defamatory statements regarding his professional competency and responsibility for the October 2015 collision in order to discredit him, obtain the termination of his employment with Marine Consultancy, and destroy his ability to work as a captain and mooring master in the Gulf of Mexico.  (Id.).

On November 15, 2019, Navig8 moved for summary judgment on each claim. (Doc. 54 at 1). Navig8 asserts it did not intend to harm Sangha or interfere in his contractual relationships, Navig8's actions were proper, and Navig8 made no false statements. (Id.).

## II. **FINDINGS OF FACT**[1]

Sangha was formerly employed by Defendant Navig8 Ship Management PTE Ltd. ("Navig8") as a ship master aboard the M/V *Miss Claudia* in the Gulf of Mexico. (Doc. 54-1 at 3, Doc. 56 at 2). Sangha was present and employed by Navig8 when an accident occurred during a ship-to-ship (STS) operation between the M/V *Miss Claudia* and the M/V *Euronike* which damaged both ships. (Doc. 54-1 at 3, Doc. 56 at 2). Sangha maintains he was not at fault and he was not the mooring master on the M/V *Miss Claudia* when the collision occurred. (Doc. 56 at 2).[2]

Sangha's employment with Navig8 was by "contract-to-contract" and his contract was complete with the M/V *Miss Claudia* soon after this incident occurred. (Doc. 56-4 at 5 (Dep. Sangha at 14); Doc. 54 at 3 (citing Doc. 56-2 at 4 (Dep. Mirchandani at 50))). Navig8 offered Sangha a contract on a different vessel in its fleet, but Sangha did not take Navig8's offer. (Doc. Doc. 54 at 3 (citing Doc. 56-2 at 4 (Dep. Mirchandani at 50)); Doc. 56 at 6). (Doc. 56-4 at 5-6 (Dep. Sangha at 14-15) (Sangha states that he did not get another contract with Navig8 after finishing his contract on the M/V *Miss Claudia,* but does not deny that he was offered a contract)). In March 2016, Sangha obtained new employment with Marine Consultancy LLC ("Marine Consultancy")[3] as a mooring master, tasked with conducting independent mooring operations and supervising STS fuel transfers in the Gulf of Mexico. (Doc. 56 at 3; Doc. 56-4 at 9; Doc. 54-1 at

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[2] After the events that form the basis for this lawsuit, Sangha was found not to be at fault for the collision. (Id.; Doc. 56-2 at 6 (Dep. Mirchandani at 57)).

[3] It is unclear which entity owned by Schild "Marine Business Exchange" or "Marine Consultancy" was Sangha's employer. (Doc. 56-3 at 2-3) Sangha testified he was not sure which entity was his employer. (Doc. 56-4 at 6-7).

3). Sangha was assigned as the mooring master for the M/V *Songa Pearl*. (Doc. 56 at 3; Doc. 54-1 at 3). Thereafter, the M/V *Songa Pearl* was assigned to conduct STS operations with the M/V *Miss Claudia*. (Doc. 56-4 at 9; Doc. 56 at 3).[4]  Navig8 employees/representatives learned of Sangha's assignment and contacted via email his new employer (Captain Schild for Marine Consultancy) with their concerns. (Doc. 54-1 at 4; Doc. 56 at 3).

The email communications between Navig8 representative, Manish Gupta (Gupta) and Marine Consultancy's Capt. Johannes Schild (Schild) are as follows:

> SENT: April 9, 2016 6:54 AM
> FROM: Manish Gupta
> TO: Marine Business Exchange- Capt. Johan Schild
> CC: tanker; Miss Claudia; Prashaant Mirchandani
> SUBJECT: RE: Miss Claudia // STS with Songa Pearl
> IMPORTANCE: High
>
> Good Day Capt. Schild,
>
> It has come to our attention that our fleet ex-Master Capt. Sangha is presently mooring master on board 'Songa Pearl' during the upcoming STS operations.
>
> As you all well aware that he was in command during collision incident between Miss Claudia/ Euronike, hence we would not like to have the Songa Pearl manouvering alongside the Miss Claudia with Capt. Sangha in charge directly or indirectly.
>
> If required, present Mooring Master from Miss Claudia can go on the 'Songa Pearl' and get her alongside or you can advise any other alternative without Capt. Sangha involvement in these operations.
>
> Look forward to your consideration.
>
> Thanks & Brgds
> Capt. Manish Gupta
>
> ***
> SENT: April 9, 2016 18:14
> FROM: Johannes Schild
> TO: Manish Gupta

---

[4] Sangha alleges he conducted eight (8) or nine (9) operations between the M/V *Songa Pearl* and the M/V *Miss Claudia* before he was terminated from Marine Consultancy.

CC: tanker <tanker@navig8shipmanagement.com>; MissClaudia
<master@missclaudia.amosconnect.com>; Prashaant Mirchandani
<Prashaant@navig8shipmanagement.com>
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Dear Capt. Manish Gupta,

We thanks you for your message and apologize for the late response on this Saturday morning.

While we understand your position in this matter, we like to point out that Capt. Sangha has actively participated with and has done in excess of 100 STS bunker operations with our mooring masters in the Gulf of Mexico. All the mooring master involved unanimously agreed that he was "good to go". This year he already has done successfully a number of STS bunker operations on the Songa Pearl as the mooring master/POAC.

However we like to satisfy your preferences as far as possible without any delays to the operations and would suggest the following alternatives.

1) The Claudia is presently steaming to the RV lightering position and will arrive this afternoon. To arrange for a crew boat to have the mooring master from the Miss Claudia to do the operation on the Songa will be difficult at such a short notice. In addition the weather report indicates increasing wind and wave action. The cost for the crew boat will be around $2,500.
2) The master on the Songa Pearl has also actively participated with and has done in excess of 150 STS bunker operations in the Gulf of Mexico. All my mooring masters reported this captain to be also a good candidate for mooring master. This master has agreed to do the operation independently with the Miss Claudia.
3) To perhaps reconsider as Capt Sangha is a very experienced mariner with an impressive resume. Any action from our side to terminate him, will hurt his future career.

We would like to hear from you soonest after review of the above alternatives and like to avoid any delays affecting the bunker operations.

You can reach me on my cell phone 504-650-5000 if needed.

Thanks and regards
Capt. Johannes Schild
Marine Business Exchange, Inc.

***

SENT: April 9, 2016 2:25 PM
FROM: Manish Gupta

TO: Capt. Johan Schild

Good Day Capt. Schild,

Thank you for your response. Had we known earlier that Capt. Sangha is under your employment, we would have let our apprehensions known. As far we are aware, he was working ashore until last month hence would not like to comment on his STS experience of 100 bunkerings.

1) To tide over the present situation, as a one off case present Master of Songa Pearl can be considered for approaching independently with Miss Claudia. However, I would suggest that present mooring master on Miss Claudia/ Capt. Sharma monitors this STS as a POAC and this operation be conducted under his guidance, even if cannot be physically transferred due to short notice. Pls confirm.

2) Decision to utilize/terminate services of Capt. Schild is entirely yours. All we wish to state that he should not be used for STS operations involving Miss Claudia any time in future. The collision incident is still under legal/insurance proceedings, hence you will appreciate that our concern is quite valid.

Master/Miss Claudia (RIC)- Pls take note of arrangements for this particular STS.

Thanks & Brgds
Capt. Manish Gupta

***

SENT: April 9, 2016 22:03
FROM: Johannes Schild
TO: Manish Gupta
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Capt Gupta I agree with that and I will instruct the MM on the Claudia to take the role ofPoac Thanks

Johann
——————————————

(Doc. 53-1 at 2-4). Schild and Navig8 representative Prashaant Mirchandani's

(Mirchandani) also exchanged emails, listed below:

SENT: April 10, 2016 11:02 PM
FROM: Prashaant Mirchandani
TO: 'info@marinebux.com'

CC: Tanker
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Hi Johann,

Hope all is well your end. Ref below, we would just like to clarify that since we have an Insurance Claim under process and some Legal Implications ref the incident between Miss Claudia and Euronike, please note that our only objection is for Capt Sangha not to be used while mooring with the Miss Claudia. Rest we have no issues with AT ALL. As you say he is experienced Mariner and you are indeed free and fortunate to have him.

Brgds/Prashaant

***

SENT: April 11, 2016 11:18 AM
FROM: Johannes Schild <info@marinebux.com>
TO: Prashaant Mirchandani
CC: tanker
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Prashaant,

Good to hear from you and thanks for your explanation.

For the time being and not to interrupt the operations I will change the MM's. on the Songa Pearl.

And as always, if I can be of assistance in anyway, I will be available.

Regards,
Johann

_____

(Doc. 53-1 at 1).

As set forth in the emails, Navig8 objected to Sangha's service as mooring master and requested a different mooring master be assigned to the M/V *Songa Pearl* for the upcoming STS operation with the M/V *Miss Claudia*. (Doc. 54-1 at 4; Doc. 56 at 3). As a result, Sangha was

removed from his assignment on the M/V *Songa Pearl*. Also, Sangha's employment with Marine Consultancy was terminated. (Doc. 56 at 3; Doc. 54-1 at 5).

## III.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats &

Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

IV. **ANALYSIS**

The Court has already determined that Sangha's claim sound in general maritime law. (see Doc. 20 at 37-39 (Adopted Report and Recommendation)). "In cases governed by maritime law, absent a relevant statute, the general maritime law, as developed by the judiciary, applies." Goncharenko v. Royal Caribbean Cruises, Ltd., 2017 WL 4326694, at *3 (S.D. Fla. June 5, 2017) (citations and internal quotation marks omitted), aff'd, 734 F. App'x 645 (11th Cir. 2018). As clarified in the leading case that federal courts follow, Wells v. Liddy, "the governing law is not the commonlaw of any single state, but rather is the general maritime law as interpreted and applied by the courts of the United States." Wells v. Liddy, 186 F.3d 505, 524 (4th Cir. 1999). And see Sutton v. Royal Caribbean Cruises Ltd., 774 Fed.Appx. 508, 513, fn. 7 (11th Cir. 2019) (citing Wells v. Liddy). Additionally, when there is "no well-developed body of general maritime law" pertaining to a cause of action, it "may be supplemented by either state law or more general common law principles." Id. (citations omitted); and see Powell v. Offshore Navigation, Inc., 644 F.2d 1063, 1065 n. 5 (5th Cir. 1981) (state law may supplement federal law).

All of Sangha's claims sound in tort. "In tort actions, courts frequently look to the *Restatement (Second) of Torts* as a source of general common law principles that should be

incorporated into the general maritime law." McMellon v. United States, 338 F.3d 287, 300 (4th Cir. 2003), vacated en banc on other grounds, 387 F.3d 329 (4th Cir. 2004); Goncharenko v. Royal Caribbean Cruises, Ltd., 2017 WL 4326694, *3 (S.D. Fla. 2017) aff'd 734 F.Appx. 645 (11th Cir. 2018) ("In cases governed by maritime law, absent a relevant statute, the general maritime law, as developed by the judiciary applies.") See, e.g., Wells, 186 F.3d at 525 (applying the Restatement (Second) of Torts rather than state law to a maritime defamation claim because of the great diversity among state defamation laws); Smolnikar v. Royal Caribbean Cruises Ltd., 787 F. Supp. 2d 1308, 1315 (S.D. Fla. 2011) ("Federal maritime law applies to actions arising from alleged torts 'committed aboard a ship sailing in navigable waters.'") (citing Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1321 (11th Cir. 1989)); Williams v. Coleman Co., Inc., 2016 WL 3166250, at *3 (N.D. Ala. Apr. 21, 2016) (applying the Restatement (Second) of Torts to tort claims under maritime law).

## A.    Tortious Interference (Claim One and Claim Three)

Sangha alleges that Navig8 intentionally interfered with his employment contract and prospective contracts with Marine Consultancy. (Doc. 30 at 4-5). On summary judgment Navig8 contends that it "had no intent to cause harm to Sangha or interfere with his employment," and that its "actions were not improper." (54-1 at 9-11).

The Court looks to general common law principles contained in the Restatement (Second) of Torts (Restatement) for the elements in tortious interference claims. Wells, 186 F.3d at 525. See also Furness Withy (Chartering, Inc., Panama v. World Energy Systems Associates, Inc., 772 F.2d 802, 807 (11th Cir. 1985) (affirming district court decision utilizing the Restatement for tortious interference claim). The Restatement describes intentional interference with performance of a contract by a third persons as follows:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Rest. at § 766 (1979). The introductory section of the Restatement explains this tort, "is intentional, in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially similar to be produced by his conduct." Restatement at *Introductory Note*. Section 776 contains the factors to consider in determining whether the interference is improper. Section 767 states:

In determining whether an actor's conduct in intentionally interfering with a contract…is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.

Id. at § 767.

**1. Intentional interference.**

The crux of Navig8's argument is that it objected to Sangha serving on the M/V *Songa Pearl* due to the ongoing insurance and litigation proceedings, but that it did not intend to improperly interfere with Sangha's employment with Marine Consultancy. (Id. at 9). In support, Navig8 submits an excerpt from Mirchandani's email to Marine Consultancy which states:

[W]e would just like to clarify that since we have an Insurance Claim under process and some Legal implications ref the incident between Miss Claudia and Euronike, please note that our only objection is for Capt. Sangha not to be used while mooring with the Miss Claudia. Rest we have no issues with [him] AT ALL. As you say he is experienced Mariner and you are indeed free and fortunate to have him.

(Doc. 54-1 at 10) (citing Doc. 53-1 at 1)). Navig8 also submits an email from Navig8 representative Gupta to Schild stating: "the [d]ecision to utilize/terminate Capt. Sangha is entirely yours [Schild's]." (Id. at 2). From this, Navig8 argues that the Court should determine that as a matter of law Navig8 did not improperly interfere with Sangha's employment.

Sangha responds that Navig8 intentionally and improperly interjected itself into his contractual relationship with Marine Consultancy, despite having "no authority or contractual relationship to control that ship." (Doc. 56 at 4). Sangha states that, "Marine Consultancy provides mooring masters for only two vessels, the M/V *Songa Pearl* and the M/V *Miss Claudia*, [so] this [objection from Navig8] required Marine Consultancy to terminate its contract with Captain Sangha." (Id.)[5]. Sangha alleges "Navig8 made it clear that Schild couldn't ever utilize Captain Sangha as mooring master on the M/V *Songa Pearl* in the future as long as Navig8 was involved." (Id.). In support, Sangha submits an April 9, 2016 email from Gupta which states: "[a]ll we wish to state that he should not be used for STS operations involving Miss Claudia anytime in the future." (Doc. 56 at 5 (citing Doc. 53-1 at 2)). From this, Sangha argues that a jury could find that Navig8 intended to interfere with Sangha's employment as it related to interaction with the M/V *Miss Claudia*.[6]

### 2. Improper interference

Per the Restatement Section 767, courts apply seven factors to determine whether an actor's conduct was improper. See *supra*.

#### (a) The Nature of the Actor's Conduct[7]

---

[5]  Navig8 does not deny they knew Marine Consultancy was limited to two vessels

[6] According to Sangha, Navig8 knew Marine Consultancy provided mooring masters for only two vessels. (Doc. 56 at 7).

[7] "This is the chief factor in determining whether the conduct is improper or not" but the Court must also consider the remaining six factors. Restatement § 767, *cmt. c.*

Sangha alleges that Navig8 threatened to exert economic pressure over Marine Consultancy through its email communications objections to his service on the M/V *Songa Pearl*. (Doc. 56 at 7). Comment c to the Restatement discusses "the nature of actor's conduct," and addresses economic pressures as follows:

> Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition…The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

Restatement § 767, *cmt. c.*

Navig8 contends that its conduct was proper because it "did not threaten Marine Consultancy, did not employ economic pressure…" (Doc. 54-1 at 12). Rather, Navig8 characterizes its conduct as: "truthful, polite email requests between business representatives regarding the performance of an operation in which they are both involved." (Id.).

The evidence indicates Marine Consultancy provided mooring masters for only two vessels—the M/V *Miss Claudia* and the M/V *Songa Pearl*. Thus, the economic impact of losing the business of the M/V *Miss Claudia* would be significant. In response to Navig8's emails Schild, in his correspondence with Gupta, stated: "we like to satisfy your preferences as far as possible without any delays to operations…" after reiterating Sangha's qualifications and experiences. (Doc. 53-1 at 3). Schild provided possible solutions for how to accommodate Navig8's objections without delay—one of which was continuing the operations with Sangha as mooring master. (Id. at 2). Gupta chose an alternative that did not require Sangha's services. Schild consented to

continue the STS operation without Sangha. (Id.).  Schild testified that he had to terminate the

contract with Sangha "because of Navig8 precluding him from acting as mooring master" and "as

long as Navig8 was involved, I couldn't put him [Sangha] on there." (Doc. 56-3 at 10-11). Schild's

response indicates that he felt significant economic pressure from Navig8 and terminated Sangha

as a result of Navig8's actions.   However, economic pressure can be appropriate if exerted in an

appropriate manner and for an appropriate reason.   The economic pressure in this instance was

exerted via polite email. The Court turns to Navig8's motive and reasons for this economic

pressure.

### (b) The Actor's Motive

Regarding motive, Navig8 asserts its primary motive was risk management, i.e. that the

accident was still under investigation, thus Sangha's work with the M/V *Miss Claudia* might cause

problems with the insurance company and litigation. (Doc. 54-1 at 13). Sangha asserts that

Navig8's reason cannot withstand scrutiny and that Navig8's reason for interfering with Sangha's

contract was because they were displeased that Sangha left the employ of Navig8. (Doc. 56 at 6).

The comments to the Restatement address motive as follows:

> the injured party must show that the interference with his contractual relations was
> either desired by the actor or known by him to be a substantially certain result of
> his conduct. Intent alone, however, may not be sufficient to make the interference
> improper, especially when it is supplied by the actor's knowledge that the
> interference was a necessary consequence of his conduct rather than by his desire
> to bring it about. In determining whether the interference is improper, it may
> become very important to ascertain whether the actor was motivated, in whole or
> in part, by a desire to interfere with the other's contractual relations. If this was the
> sole motive the interference is almost certain to be held improper. A motive to
> injure another or to vent one's ill will on him serves no socially useful purpose.

Restatement § 767, *cmt. d*.

Sangha attempts to cast doubt on Navig8's stated motive by pointing out that Navig8

presented no evidence that "Navig8's insurance underwriters would somehow hold the identity of

the mooring master on the *Songa Pearl*" against Navig8. (Doc. 56 at 6). Moreover, Sangha contends that Navig8's offer to continue Sangha employment on another Navig8 vessel "would give Navig8's insurer more concern than his serving in an advisory role on a ship over which Navig8 had no control." (Id.). From this, according to Sangha, a jury could reasonably find Navig8's stated reason for interfering with Sangha's employment is not the real reason. And based on the the fact that they gave a false reason coupled with the animosity shown to him by Mirchandani,[8] Sangha asserts that a jury could find that the real reason is because Navig8 was displeased with Sangha's leaving Navig8 and taking a new and better job with a different company In other words, Sangha contends Navig8 actions were vindictive.

### (c) The Interests of the Other with Which the Actor's Conduct Interferes

Sangha contends his interest "as a working captain's career and employment is certainly more worthy of protection than a former employer's vindictiveness." (Doc. 56 at 7). Comment e provides:

> Some contractual interests receive greater protection than others. Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference *would be improper if it involved persuading the third party to commit a breach of an existing contract with the other*. (See, for example, § 768). The result in the latter case is due in part to the greater definiteness of the other's expectancy and his stronger claim to security for it and in part to the lesser social utility of the actor's conduct...Even with reference to contracts not subject to these objections [i.e., contracts that violate public policy], however, it may be found to be not improper to induce breach when the inducement is justified by the other factors stated in this Section. (See, for example, § 770).

*Restatement* § 767 *cmt. e.* (emphasis added).

Sangha had an existing contract with Marine Consultancy. But see Daily v. The Rawlings Company, LLC, 2016 WL 192071, *15 (N.D. Ala. 2016) (this factor weighed in defendant's favor

---

[8] Sangha testified that Mirchandani was rude to him when he contacted Mirchandani in an effort to save his job. (Doc. 56-4 at 13-14)

because there was no contract between the third party and the plaintiff). The emails support that Navig8 acted to prevent Sangha from serving as mooring master on M/V *Songa Pearl* while it interacted with the M/V *Miss Claudia*. And since Marine Consultancy had only two vessels for which they provided mooring masters (M/V *Miss Claudia* and the M/V *Songa Pearl*), Marine Consultancy determined it had to terminate Sangha due to Navig8's objections. (Doc. 56-3 at 10-11). Accordingly, Navig8's actions led to Marine Consultancy breaking its contract with Sangha.

### (d) The Interests Sought to be Advanced by the Actor

According to Sangha, Navig8 had no legitimate reason to interfere in his relationship with Marine Consultancy—any risk management reason was pretextual. (Doc. 56 at 7). Comment f provides in part:

> Usually the actor's interest will be economic, seeking to acquire business for himself. An interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means. (See § 768). If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor's own interest in taking that established right from him. Of course, the interest in gratifying one's feeling of ill will toward another carries no weight. Some interests of the actor that do carry weight are depicted in §§ 770-773.

*Restatement* § 767 *cmt. f.* Section 772 provides "a special application of the general test for determining whether an interference with a[]...prospective contractual relation is improper or not."

*Restatement* § 772 *cmt. a.* Section 772 states:

> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
>
> (a) truthful information, or
>
> (b) honest advice within the scope of a request for the advice.

Id.

15

Here, Navig8 argues it did not seek to acquire business for itself; its interest instead was primarily risk management. (Doc. 54-1 at 13). Per Navig8, due to its business interest in the STS operation, it had "every right to input into who will be providing the oversight and guidance for the STS operations that its vessel will be conducting…" (Id. at 13). Navig8 asserts it communicated truthful information about ongoing litigation and insurance proceedings which involved Sangha.

As previously discussed, Sangha has presented some evidence that Navig8's motive was not as stated, but rather vindication for Sangha not accepting employment with Navig8 on a vessel other than the M/V *Miss Claudia*.

### (e) The Social Interests in Protecting the Freedom of Action of the Actor and the Contractual Interests of the Other

Sangha contends the "[s]ocial interests in this case clearly weigh in [his] favor as a working captain's career and employment is certainly more worth of protection than a former employer's vindictiveness." (Doc. 56 at 7). Comment g provides:

> Appraisal of the private interests of the persons involved may lead to a stalemate unless the appraisal is enlightened by a consideration of the social utility of these interests. Moreover, the rules stated in §§ 766-766B deal with situations affecting both the existence and the plan of competitive enterprise. The social interest in this enterprise may frequently require the sacrifice of the claims of the individuals to freedom from interference with their pursuit of gain. Thus, it is thought that the social interest in competition would be unduly prejudiced if one were to be prohibited from in any manner persuading a competitor's prospective customers not to deal with him. On the other hand, both social and private interests concur in the determination that persuasion only by suitable means is permissible, that predatory means like violence and fraud are neither necessary nor desirable incidents of competition. (See further § 768).

*Restatement* § 767 *cmt. g*.

Navig8 asserts it had a risk management interest, which if true would arguably be a legitimate reason to have acted as they did. However, if the actions were vindictive, such would not further the societal interest of competition.

### (f) The Proximity or Remoteness of the Actor's Conduct to the Interference

Comment h to the Restatement states:

*Proximity or remoteness of actor's conduct to interference.* One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, and mere knowledge that this consequence is substantially certain to result may be sufficient.

*Restatement § 767 cmt. g.*

Here, Navig8 directly objected to Sangha serving as mooring master on the M/V *Songa Pearl* during its STS operations involving the M/V *Miss Claudia.* And since it appears that Navig8 knew of Marine Consultancy's limited business, a reasonable jury could find that Navig8 knew that termination of Sangha was substantially certain to be the result of their action.

### (g) The Relations Between the Parties.

Comment i to the Restatement states:

i.      *Relations between the parties.* The relation between the parties is often an important factor in determining whether an interference is proper or improper. In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties. Thus, A and B may be competitors, and A's conduct in inducing C not to deal with B may be proper, though it would have been improper if he had not been a competitor. (See § 768). Or, if A is C's business advisor, it is proper for him to advise C, in good faith and within the scope of C's request for advice, that it would be to his financial advantage to break his contract with B, while it would be improper if he were a volunteer. (See § 772). Again, it is important whether the relationship between B and C is that of a prospective contract, an existing contract or a contract terminable at will. (See § 768).

*Restatement § 767 cmt. g.*

Sangha was formerly employed by Navig8, was presently employed by Marine Consultancy. Sangha was employed via contract as a subcontractor mooring master. (Doc. 56-1). The contract is barebones and does not indicate whether it is terminable at will.

In sum, Navig8 contends it was its business relationship with Marine Consultancy, its involvement in the STS transfer, and its desire to manage risk that warranted its objection to Sangha acting as the mooring master in an operation involving the M/V *Miss Claudia*. Sangha contends the objection was rooted in Navig8's vindictiveness against Sangha for leaving Navig8's employ. And since there is evidence to support both contentions, it is an issue of fact not properly resolved on summary judgment. Accordingly, upon consideration of all of the factors, the Court finds that there are issues of material fact for the jury to resolve. Thus, Navig8's motion for summary judgment is **DENIED** as to Count One and Three.

## B. <u>Defamation (Claim Two)</u>

In the absence of a well-developed body of general maritime law of defamation, the Court looks to "the common law as compiled in the Restatement (Second) of Torts" to "control our evaluation" of Sangha's defamation claim. See Wells, 186 F.3d at 525; Barnes v. Carnival Corporation, 2006 WL 8433555, *2 (S.D. Fla. 2006) (citing Wells, 186 F.3d at 525). Diamond Offshore, 2012 WL 253381, at *7. The Restatement lists the following elements for a defamation claim:

(a)    a false and defamatory statement[9] concerning another;
(b)    an unprivileged publication to a third party;
(c)    fault amounting to at least negligence on the part of the publisher; and
(d)    either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Rest. at § 558 (1977). Further, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." <u>Id.</u> at § 559. "The court determines whether a

---

[9] See Restatement at § 577 (explaining defamatory communications can be published when spoken (slander) or when written and brought to the attention of a third party (libel)).

communication is capable of bearing the meaning ascribed to it by the plaintiff and whether the meanings so ascribed are defamatory in character." Id. at § 614, *cmt. e*. In determining whether words are capable of conveying a defamatory meaning the court must:

> …take into account all the circumstances surrounding the communication of the matter complained of as defamatory. Thus, the context of written or spoken words is an important factor in determining the meaning that they reasonably might convey to the person who heard or read them. (See § 563, Comment *d*). So too, the extrinsic circumstances surrounding the publication are important in determining the understanding of the recipient of the communication. (See § 563, Comment *e*). In determining the defamatory character of language, the meaning of which is clear or otherwise determined, the social station of the parties in the community, the current standards of moral and social conduct prevalent therein, and the business, profession or calling of the parties are important factors. **Thus, an imputation may be defamatory as applied to one person at a given time and place, although it would not be derogatory of another person at a different time or in a different place**. In some cases, imputations are so clearly innocent or so clearly defamatory that the court is justified in determining the question itself. On the other hand, if, in the opinion of the court, the question is one on which reasonable men might differ, it is for the jury to determine which of the two permissible views they will take. These issues, being questions of judgment, are more frequently determined finally by the court than issues that involve only the determination upon conflicting evidence of questions of fact.

Id. § 614 *cmt. d* (emphasis added). Section 577 defines publication, element (b), as follows:

> (1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed.
> (2) One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication.

Id. § 577. Section 580B defines fault, element (c), with respect to defamation of a private person:

> One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
> > (a) knows that the statement is false and that it defames the other,
> > (b) acts in reckless disregard of these matters, or
> > (c) acts negligently in failing to ascertain them.

Id. § 580B. As to element (d), special harm is not required to impose liability for written defamatory communications—i.e. libel. Section 569 describes the harm necessary to impose liability:

> One who falsely publishes matter defamatory of another in such a manner as to make the publication a libel is subject to liability to the other although no special harm results from the publication.

Id. § 569. The comments to Section 569 explain damages as:

> Although special damages need not be proved if the communication is actionable per se, the Constitution is now held by the Supreme Court to require proof of "actual injury" to the plaintiff, at least if the defendant did not have knowledge of the falsity of the statement or act in reckless disregard as to its truth. (See § 621).

Id. at *cmt. c*.

First, the presence of a false and defamatory statement. Navig8 asserts "[t]he email communications are true." (Doc. 54-1 at 14, 17). Rather than contesting the veracity of the individual statements in the emails, Sangha counters that the communications, when read together, *imply* a false and defamatory statement— that Sangha caused the October 2015 collision between vessels, which entangled Navig8 in costly litigation. (Doc. 56 at 8). The Court finds that as a matter of law no such implication could reasonable be inferred. Accordingly, Navig8 is **GRANTED** summary judgment on the claim of defamation (Claim Two).

## C.      Intentional Infliction of Emotional Distress (Claim Four)

Although maritime law does not expressly provide a cause of action for emotional distress, a plaintiff may bring an IIED claim under general maritime law. Elbaz v. Royal Caribbean Cruises, Ltd., 2017 WL 3773721, at *4 (S.D. Fla. Jan. 12, 2017); see also Markham v. Carnival Corp., 2012 WL 12866787, at *3 (S.D. Fla. Dec. 3, 2012); Fawkner v. Atlantis Submarines, Inc., 135 F. Supp. 2d 1127, 1135-36 (D. Haw. 2001). Since there is no maritime law concerning IIED claims, courts regularly employ the Restatement to evaluate such claims. Broberg v. Carnival Corp., 303 F. Supp.

3d 1313, 1318 (S.D. Fla. 2017) (looking to the standards set forth in the Restatement for IIED claim); and Wu v. NCL (Bahamas) Ltd., 2017 WL 1331712, at *2 (S.D. Fla. Apr. 11, 2017) (same). See e.g., Wallis v. Princess Cruises, Inc., 306 F.3d 827, 841 (9th Cir. 2002) ("While we do not regard the Restatement (Second) of Torts as the only source of maritime law governing claims for intentional infliction of emotional distress, we recognize that it has been regularly employed by other courts to evaluate intentional infliction of emotion distress claims in federal maritime cases."). Additionally, it is permissible for court to refer to state law for guidance, particularly when considering whether the conduct alleged is sufficiently extreme and outrageous to form the basis for an IIED claim. See Powell v. Offshore Navigation, Inc., 644 F.2d 1063, 1065 n. 5 (5th Cir. 1981) ("State law may ... supplement federal maritime law, as in the exercise of its police powers or in the additional maritime tort remedy; state law may not, however, conflict with federal maritime law, as it would be redefining the requirements or limits of a remedy available at admiralty.").[10] See e.g., Negron v. Celebrity Cruises, Inc., 2018 WL 3369671, at *2 (S.D. Fla. July 10, 2018) (surveying Florida and maritime cases determining whether alleged conduct is sufficiently outrageous to support IIED claims).

Section 46 of the Restatement provides, in relevant part, that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." Restatement at § 46. "Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law for the court to decide, not a question of fact." Broberg at 1318 (S.D. Fla. 2017). There is

---

[10] All decisions of the former Fifth Circuit rendered prior to October 1, 1981 serve as binding precedent on the current Eleventh Circuit. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

no comprehensive or definitive list of what constitutes outrageous conduct. Id. However, *Comment d* to Section 46 of the Restatement proves instructive:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!"

Restatement at § 46 *cmt. d*.

With these principles in mind, the Court must determine whether the communications between Marine Consultancy and Navig8 crossed all bounds of decency and is properly regarded as atrocious and utterly intolerable in a civilized community. Specific to the emails, Navig8 asserts the emails were a "reasoned and limited request, founded in risk management…" and that "[t]here is no evidence that could even remotely be considered to rise to the level of deplorable conduct necessary for an IIED claim." (Doc. 51-4 at 19). Sangha responds that the "loss of job is one of the most stressful events in a person's life" and that Navig8's attack on his professional reputation crossed all bounds of decency and should be considered outrageous. (Doc. 56 at 9-10).

The Alabama Supreme Court has held that job terminations generally do not constitute outrageous conduct sufficient to support an IIED claim. See Harrell v. Reynolds Metals Co., 495 So. 2d 1381, 1387 (Ala. 1986) (finding the termination did not contravene public policy); Wood v. Jim Walter Homes, Inc., 554 So. 2d 1028, 1028–29 (Ala. 1989) (the only fact presented – that the employee was fired by phone instead of in person—was not sufficiently outrageous). "[T]he line of demarcation between non-actionable [IIED] claims and actionable [IIED] claims in the employment arena is found in the determination of whether the termination is for reasons that

contravene public policy." Lees v. Sea Breeze Health Care Center, Inc., 391 F.Supp.2d 1103, 1107 (S.D. Ala. 2005). See Rice v. United Ins. Co. of America, 465 So.2d 1100, 1102 (Ala.1984) (trial court erred in dismissing outrage claim where pregnant employee claimed employer discriminated because of her pregnancy by engaging in a pattern of conduct over a period of several months aimed at forcing her to leave her job, thereby violating plaintiff's federally protected right to be free from discrimination based on sex); Cunningham v. Dabbs, 703 So.2d 979, 983 (Ala.Civ.App.1997) (finding jury question on outrage claim where plaintiff did not claim wrongful discharge of at-will employee, but instead alleged a pattern of harassment and a termination of employment in violation of her fundamental right to marry).

The Court also finds the reasoning in Thomas v. Williams, 21 So. 3d 1234 (Ala. Civ. App. 2008) helpful.[11] In Thomas, the plaintiff alleged that shortly after the jury verdict in a wrongful death case, the doctor called the plaintiff's employer (also a physician) with the intent to cause plaintiff's employer to terminate her. Id. at 1240. The plaintiff alleged she lost her job because of the doctor's actions. Id. The court found the plaintiff alleged facts sufficient to state a claim for intentional interference with business relations but dismissed the plaintiff's IIED claim because the alleged conduct was not so outrageous and extreme as to cross beyond the bounds of decency. Id. at 1240, 1243. Thus, even assuming a vindictive motive, the court found that it did not reach the outrageous level necessary to support a claim of intentional infliction of emotional distress.

The only evidence of communications between Navig8 and Marine Consultancy regarding Sangha's employment are encompassed in the emails. No reasonable factfinder could find from these emails that Navig8's correspondence was "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly

---

[11] While the facts are not identical, the rationale is instructive.

intolerable in a civilized community." Restatement at § 46 *cmt. d*. Regardless of its motives as they relate to Sangha, Navig8 had a legitimate interest in operations involving the M/V *Miss Claudia* and could be expected to communicate preferences and requests regarding the operations of its ship.  Thus, even accepting Sangha's allegations that Navig8 was being vindictive, the Court finds that these allegations fail to describe behavior extreme and outrageous enough to support an IIED claim.  Accordingly, Navig8's motion as to Sangha's IIED claim, Claim Four, is **GRANTED**.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Navig8's motion for summary judgment as to Defamation (Claim Two) and Intentional Infliction of Emotional Distress (Claim Four) is **GRANTED.** Navig8's motion for summary judgment as to Tortious Interference with Current and Future Contractual Relations (Claims One and Three) is **DENIED**.

**DONE** and **ORDERED** this the **11th** day of **February 2020**.

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**