IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MANJIT SANGHA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION: 18-00131-KD-B |
| ) | |
| NAVIG8 SHIP MANAGEMENT PTE ) | |
| LTD., ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This case concerns Captain Manjit Sangha (Sangha)'s loss of a job, through no fault of his own, as mooring master on the M/V *Songa Pearl*. Captain Sangha claims Navig8 Ship Management PTE Ltd. (Navig8) intentionally and improperly interfered in his employment contract with Marine Consultancy resulting in his termination. A non-jury trial was held on July 21-22, 2020. Upon consideration of the parties' arguments, documentary and testimonial evidence presented at trial, the Court makes the following findings of fact and conclusions of law.

**I.    FINDINGS OF FACT**

By all accounts, Captain Sangha is an experienced Mariner with a good employment record as a captain of vessels and briefly as a mooring master. Between 2009-2015 Sangha was employed by Navig8 as a ship master (captain). Sangha was captain on the M/V *Miss Claudia* when an accident occurred in November 2015 during a ship-to-ship (STS) operation between the M/V *Miss Claudia* and the M/V *Euronike*. Both ships sustained damage. Navig8 considered the incident to be significant because both tankers were carrying oil. Thereafter, Navig8 reported the incident to their insurance carrier, and to the major oil companies for which they were transporting oil. Both

vessels filed claims against each other and with their insurance carriers. As a result, several investigations into the incident were initiated.[1]

Sangha's employment with Navig8 was by "contract-to-contract" and his contract was complete with the M/V *Miss Claudia* a few days after this incident occurred. When his contract was complete, Navig8 decided not to re-assign Sangha to the *M/V Miss Claudia* while the investigations related to incident were ongoing. According to Prashaant Mirchandani, managing director of Navig8, this decision was made because Navig8 did not believe it was prudent to have the men involved in the incident back on the ship until the matter was cleared. As Mirchandani explained, shipping is a risk laden business and STS operations involving oil adds an additional layer of risk. Schild, owner of Marine Consultancy, concurred that it is reasonable and not unusual to decline to put an individual involved in an accident back on the involved ship.

When Sangha finished his contract on the M/V *Miss Claudia*, Navig8 offered Sangha contracts on three other vessels in its fleet. Sangha did not accept any of Navig8's offers because Sangha believed it would impede his path to U.S. citizenship.[2] This did not cause any problems for Navig8 because they had sufficient personnel to crew their vessels.

Between at least November 2015 and March 2016, Sangha, through his company Ocean Marine, provided supplies to vessels. Navig8 was a customer of Ocean Marine.

In March 2016, Sangha began employment with Marine Consultancy LLC ("Marine Consultancy") as a mooring master. Sangha's contract provided that he would earn $800 for each day worked. It was expected that he would receive six to eight week assignments, two-three times a year. Sangha was tasked with conducting independent mooring operations and supervising STS

---

[1] After the events that form the basis of this lawsuit, Sangha was found not to be at fault for the collision.

[2] Sangha is a legal permanent resident. As such, he must be physically present in the U.S. for 30 months of the five year period before he applies for citizenship.

fuel transfers in the Gulf of Mexico. Sangha was assigned as the mooring master for the M/V *Songa Pearl*. The M/V *Songa* Pearl was time chartered by Glencore. Marine Consultancy had a contract with Glencore to provide the mooring master for the ship.

Thereafter, the M/V *Songa Pearl* was assigned to conduct STS operations with the M/V *Miss Claudia*. Sangha performed at least one STS with the M/V *Miss Claudia*. However, in April 2016, Navig8 employees/representatives learned of Sangha's assignment and contacted via email his new employer (Captain Schild for Marine Consultancy) with their concerns. In sum, Navig8 did not believe it was prudent for Sangha to participate in STS operations with the *Miss Claudia* until the investigations of the November 2015 incident were complete. The investigations were not completed when these concerns were expressed.

The Court understands the email communications amongst Navig8 representatives (Manish Gupta (Gupta) and Prashaant Mirchandani), Marine Consultancy's Capt. Johannes Schild (Schild), and Terese Girvan (Glencore's representative) occurred in the following sequence[3]:

> SENT: April 9, 2016 6:54 AM
> FROM: Manish Gupta
> TO: Marine Business Exchange- Capt. Johan Schild
> CC: tanker; Miss Claudia; Prashaant Mirchandani
> SUBJECT: RE: Miss Claudia // STS with Songa Pearl
> IMPORTANCE: High
>
> Good Day Capt. Schild,
>
> It has come to our attention that our fleet ex-Master Capt. Sangha is presently mooring master on board 'Songa Pearl' during the upcoming STS operations.
>
> As you all well aware that he was in command during collision incident between Miss Claudia/ Euronike, hence we would not like to have the Songa Pearl manouvering alongside the Miss Claudia with Capt. Sangha in charge directly or indirectly.

---

[3] The times noted on the emails are not sequential because the emails were sent and received in different time zones around the world.

If required, present Mooring Master from Miss Claudia can go on the 'Songa Pearl' and get her alongside or you can advise any other alternative without Capt. Sangha involvement in these operations.

Look forward to your consideration.

Thanks & Brgds
Capt. Manish Gupta

---

SENT: April 9, 2016 17:00 +0000 Msg: A35342-119498
FROM: MISS CLAUDIA – MASTER
TO: Terese.Girvan@Glencore-us.com
SUBJECT: Miss Claudia // STS with Songa Pearl

Good day Terese,

Kindly note below mail from our technical managers regarding STS with Songa Pearl. Kindly advise on below as there has been no reply from Capt Schild and our office is asking for it.

Thank you,
Capt. Anubhav Wadhwa
Master
M.T. MISS CLAUDIA

---

SENT: April 9, 2016 18:14
FROM: Johannes Schild
TO: Manish Gupta
CC: tanker <tanker@navig8shipmanagement.com>; MissClaudia <master@missclaudia.amosconnect.com>; Prashaant Mirchandani <Prashaant@navig8shipmanagement.com>
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Dear Capt. Manish Gupta,

We thanks you for your message and apologize for the late response on this Saturday morning.

While we understand your position in this matter, we like to point out that Capt. Sangha has actively participated with and has done in excess of 100 STS bunker operations with our mooring masters in the Gulf of Mexico. All the mooring master involved unanimously agreed that he was "good to go". This year he already has

4

done successfully a number of STS bunker operations on the Songa Pearl as the mooring master/POAC.

However we like to satisfy your preferences as far as possible without any delays to the operations and would suggest the following alternatives.

1) The Claudia is presently steaming to the RV lightering position and will arrive this afternoon. To arrange for a crew boat to have the mooring master from the Miss Claudia to do the operation on the Songa will be difficult at such a short notice. In addition the weather report indicates increasing wind and wave action. The cost for the crew boat will be around $2,500.
2) The master on the Songa Pearl has also actively participated with and has done in excess of 150 STS bunker operations in the Gulf of Mexico. All my mooring masters reported this captain to be also a good candidate for mooring master. This master has agreed to do the operation independently with the Miss Claudia.
3) To perhaps reconsider as Capt Sangha is a very experienced mariner with an impressive resume. Any action from our side to terminate him, will hurt his future career.

We would like to hear from you soonest after review of the above alternatives and like to avoid any delays affecting the bunker operations.

You can reach me on my cell phone 504-650-5000 if needed.

Thanks and regards
Capt. Johannes Schild
Marine Business Exchange, Inc.

---

SENT: April 9, 2016 2:25 PM
FROM: Manish Gupta
TO: Capt. Johan Schild

Good Day Capt. Schild,

Thank you for your response. Had we known earlier that Capt. Sangha is under your employment, we would have let our apprehensions known. As far we are aware, he was working ashore until last month hence would not like to comment on his STS experience of 100 bunkerings.

1) To tide over the present situation, as a one off case present Master of Songa Pearl can be considered for approaching independently with Miss Claudia. However, I would suggest that present mooring master on Miss Claudia/ Capt. Sharma monitors this STS as a POAC and this operation be conducted under

5

his guidance, even if cannot be physically transferred due to short notice. Pls confirm.

2) Decision to utilize/terminate services of Capt. Schild is entirely yours. All we wish to state that he should not be used for STS operations involving Miss Claudia any time in future. The collision incident is still under legal/insurance proceedings, hence you will appreciate that our concern is quite valid.

Master/Miss Claudia (RIC)- Pls take note of arrangements for this particular STS.

Thanks & Brgds
Capt. Manish Gupta

---

SENT: April 9, 2016 22:03
FROM: Johannes Schild
TO: Manish Gupta
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Capt Gupta I agree with that and I will instruct the MM on the Claudia to take the role of Poac Thanks

Johann

---

SENT: April 9, 2016 8:38 PM
FROM: Terese.Girvan@Glencore-us.com
TO: info@marinebux.com
CC: Farouk.Ayoub@glencore-us.com
SUBJECT: Capt Sangha

Good Evening Johannes,

Further to our earlier conversation please make arrangements to remove Captain Sangha as Mooring Master of the Songa Pearl soonest. As his employment had already caused potential interruptions to our operations I cannot have him operating either vessel. Please advise when a new Mooring Master will be available to take over and please provide name of replacement Mooring Master once available.

Thank you and have a good weekend,
Teresa Girvan

SENT: April 10, 2016 11:02 PM
FROM: Prashaant Mirchandani
TO: 'info@marinebux.com'
CC: Tanker
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Hi Johann,

Hope all is well your end. Ref below, we would just like to clarify that since we have an Insurance Claim under process and some Legal Implications ref the incident between Miss Claudia and Euronike, please note that our only objection is for Capt Sangha not to be used while mooring with the Miss Claudia. Rest we have no issues with AT ALL. As you say he is experienced Mariner and you are indeed free and fortunate to have him.

Brgds/Prashaant

---

SENT: April 11, 2016 11:18 AM
FROM: Johannes Schild <info@marinebux.com>
TO: Prashaant Mirchandani
CC: tanker
SUBJECT: RE: Miss Claudia // STS with Songa Pearl

Prashaant,

Good to hear from you and thanks for your explanation.

For the time being and not to interrupt the operations I will change the MM's. on the Songa Pearl.

And as always, if I can be of assistance in anyway, I will be available.

Regards,
Johann

---

As set forth in the emails, Navig8 objected to Sangha's service as mooring master when conducting operations with the *Miss Claudia* and requested a different mooring master be assigned to the M/V *Songa Pearl* for the upcoming STS operation with the M/V *Miss Claudia*. Thereafter,

Glencore (charterer of the *Songa Pearl*) told Marine Consultancy to remove Sangha from the *Songa Pearl*. Sangha was removed from his assignment on the M/V *Songa Pearl*.

After Sangha was notified that he was being removed from the *Songa Pearl,* he contacted Michandani. Sangha wanted Mirchandani to call Terese Girvan from Glencore and ask her to reconsider her decision to remove Sangha from the *Songa Pearl*. On the first call, Mirchandani told Sangha that he was busy and for Sangha to call back. When Sangha called back, Mirchandani told him he would not call Girvan on Sangha's behalf. Mirchandani also told him to stop calling or he would put him on the blacklist for mariner jobs. Sangha believed that Mirchandani had treated him rudely.

Marine Consultancy only had two vessels for which they provided mooring masters; the *Songa Pearl* and the *Miss Claudia*. The *Songa Pearl* was scheduled to conduct STS operations with the *Miss Claudia* approximately every three weeks. The STS operation involved the *Songa Pearl* approaching the *Miss Claudia*, and then transferring fuel oil from the *Miss Claudia* (the larger vessel) to the *Songa Pearl*. This operation is called "lightering" and requires the assistance of a mooring master on the approaching vessel. Thereafter, over the next 2-3 weeks, the *Songa Pearl* would distribute the fuel to smaller vessels. This distribution to smaller vessels is referred to as bunkering and does not require a mooring master, although it is prudent to have one.

As a result of complying with Navig8's request and Glencore's demand that Sangha be removed from the *Songa Pearl*, Marine Consultancy did not have a vessel to which they could assign Sangha as the mooring master. Sangha's employment with Marine Consultancy was terminated, although Marine Consultancy did not want to do so. Schild believed that Sangha would easily be able to obtain employment as a mooring master with another company.

After Sangha's termination, he became depressed and was unable to sleep properly. He inquired with other companies that provided mooring masters, but no position was immediately available to him. After a couple of weeks, Sangha was able to obtain employment in India as captain of a vessel. Sangha currently earns as a captain approximately $13,900 for each month he works (approximately 7-8 months a year).

## II.     Applicable Law and Burdens of Proof

The Court looks to general common law principles contained in the Restatement (Second) of Torts (Restatement) for the elements in tortious interference claims. Wells, 186 F.3d at 525. See also Furness Withy (Chartering), Inc., Panama v. World Energy Systems Associates, Inc., 772 F.2d 802, 807 (11th Cir. 1985) (affirming district court decision utilizing the Restatement for tortious interference claim). The Restatement describes intentional interference with performance of a contract by a third persons as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979). The introductory section of the Restatement explains this tort, "is intentional, in the sense that the defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct." Restatement at *Introductory Note to Chapter 37*. See Moore Oil Co., Inc., v. D&D Oil Co., Inc., 747 F.Supp.2d 1280, 1292 (N.D. Ala. 2010) (finding competing petroleum distributor did not intentionally interfere with family-owned distributor's contract with service station); Furness Withy (Chartering), Inc., Panama, 772 F.2d at 807 (finding the interference was not intentional where the defendant did not "induce" or "force" the breach).

It is the plaintiff's burden to prove intentional interference with a contract and consequential harm to the plaintiff. Thompson v. Allstate Ins. Co., 476 F.2d 746, 748 (5th Cir. 1973).[4] It then becomes the defendant's burden to prove that its "interference" is justified and not improper. Daily v. Rawlings Co., LLC, 2016 WL 192071, at *12-13 (N.D. Ala. Jan. 15, 2016).

The Court finds that Navig8 intentionally interfered with Sangha's employment contract with Marine Consultancy. There is no evidence that Navig8's request, that Sangha not be allowed to work as the mooring master on the *Songa Pearl* while it conducted STS operation with the *Miss Claudia,* was vindictive or meant to harm Sangha. However, considering Navig8's experience in the marine industry, it is not credible that they would not have known that their request would result in Sangha's contract as the mooring maser on the *Songa Pearl* being put in jeopardy.

However, the interference must also be improper. Section 767 of the Restatement (Second) of Torts states:

> In determining whether an actor's conduct in intentionally interfering with a contract…is improper or not, consideration is given to the following factors:
>
>   (a) the nature of the actor's conduct,
>   (b) the actor's motive,
>   (c) the interests of the other with which the actor's conduct interferes,
>   (d) the interests sought to be advanced by the actor,
>   (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>   (f) the proximity or remoteness of the actor's conduct to the interference and
>   (g) the relations between the parties.

Id. at § 767. See e.g., Daily v. The Rawlings Company, LLC, 2016 WL 192071, *15 (N.D. Ala. 2016) (analyzing these factors); Cableview Communs. of Jacksonville v. Time Warner Cable Southeast LLC, 2014 WL 1268584, *12 (M.D. Fla. 2014) (finding summary judgment improper

---

[4] All decisions of the former Fifth Circuit rendered prior to October 1, 1981 serve as binding precedent on the current Eleventh Circuit. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

because plaintiffs allegations that defendants leveraged payment over plaintiffs could be improper); Diefenderfer v. Ford Motor Co., 916 F.Supp. 115, 1160 (M.D. Ala. 1995) (quoting Gross v. Lowder Realty Better Homes & Garens, 494 So.2d 590, 597, n.3 (Ala. 1986) (relying on the Restatement)) ("If a defendant's interference is unjustified under the circumstances of the case, it is improper.").

### (a) The Nature of the Actor's Conduct[5]

Comment c to the Restatement discusses "the nature of actor's conduct," and addresses economic pressures as follows:

> Economic pressure of various types is a common means of inducing persons not to deal with another, as when A refuses to deal with B if B enters into or continues a relation with C, or when A increases his prices to B or induces D not to deal with B on the same condition…The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

*Restatement § 767, cmt. c.* See e.g., Hightower v. Aramark Corp., 2012 WL 827113, *4-5 (N.D. Miss. 2012) (finding actor's conduct proper because actor did not actively solicit business). In this case, Navig8's conduct was based solely on its reasonable perception that until the November 2015 incident had been cleared and fault determined, it was not prudent to have Sangha act as the mooring master for STS operations involving the *Miss Claudia*. And while this concern resulted in serious consequences to Sangha, it was nevertheless an appropriate business concern.

### (b) The Actor's Motive

The comments to the Restatement address motive as follows:

---

[5] "This is the chief factor in determining whether the conduct is improper or not" but the Court must also consider the remaining six factors. *Restatement § 767*, **cmt. c.**

> the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose.

*Restatement* § 767, *cmt. d*.  Despite Sangha's insinuation otherwise, there is insufficient evidence to support an improper motive underlying Navig8's request.  There is no evidence that Navig8 acted vindictively or with ill-will in the request concerning Sangha.

### (c) The Interests of the Other with Which the Actor's Conduct Interferes

Comment e explains this factor as follows:

> Some contractual interests receive greater protection than others. Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference *would be improper if it involved persuading the third party to commit a breach of an existing contract with the other*. (See, for example, § 768). The result in the latter case is due in part to the greater definiteness of the other's expectancy and his stronger claim to security for it and in part to the lesser social utility of the actor's conduct...Even with reference to contracts not subject to these objections [i.e., contracts that violate public policy], however, it may be found to be not improper to induce breach when the inducement is justified by the other factors stated in this Section. (See, for example, § 770).

*Restatement* § 767 *cmt. e.* (emphasis added). See Daily v. The Rawlings Company, LLC, 2016 WL 192071, *15 (N.D. Ala. 2016) (this factor weighed in defendant's favor because there was no contract between the third party and the plaintiff).  This factor weighs in Sangha's favor because he had an existing contract with Marine Consultancy.

### (d) The Interests Sought to be Advanced by the Actor

Comment f explains this factor in part as:

> Usually the actor's interest will be economic, seeking to acquire business for himself. An interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means. (See § 768). If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor's own interest in taking that established right from him. Of course, the interest in gratifying one's feeling of ill will toward another carries no weight. Some interests of the actor that do carry weight are depicted in §§ 770-773.

*Restatement* § 767 *cmt. f.*  Navig8's interest was risk management.  As explained colloquially by Mirchandani at trial, if Sangha had been allowed to be the mooring master for STS operation with the *Miss Claudia* and another incident had occurred, "they would have been taken to the cleaners." Considering that a determination as to fault of the November 2015 incident had not been made, the Court does not find fault in Navig8 effort to protect its economic interest by requesting a moratorium on Sangha's services until the investigations concluded.

### *(e) The Social Interests in Protecting the Freedom of Action of the Actor and the Contractual Interests of the Other*

Comment g to the Restatement describes this factor as follows:

> Appraisal of the private interests of the persons involved may lead to a stalemate unless the appraisal is enlightened by a consideration of the social utility of these interests. Moreover, the rules stated in §§ 766-766B deal with situations affecting both the existence and the plan of competitive enterprise. The social interest in this enterprise may frequently require the sacrifice of the claims of the individuals to freedom from interference with their pursuit of gain. Thus, it is thought that the social interest in competition would be unduly prejudiced if one were to be prohibited from in any manner persuading a competitor's prospective customers not to deal with him. On the other hand, both social and private interests concur in the determination that persuasion only by suitable means is permissible, that predatory means like violence and fraud are neither necessary nor desirable incidents of competition. (See further § 768).

*Restatement* § 767 *cmt. g.*  Since this case does not involve interference based on a competitive motive, this factor is not particularly relevant.  However, the Court recognizes that Sangha's interest in continued employment is equal to Navig8 interest in economic stability.

### *(f) The Proximity or Remoteness of the Actor's Conduct to the Interference*

Comment h to the Restatement states:

*Proximity or remoteness of actor's conduct to interference.* One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, and mere knowledge that this consequence is substantially certain to result may be sufficient.

Restatement § 767 cmt. g.  As previously discussed, Navig8's interference was direct.

### *(g) The Relations Between the Parties.*

Comment i to the Restatement states:

*Relations between the parties.* The relation between the parties is often an important factor in determining whether an interference is proper or improper. In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties. Thus, A and B may be competitors, and A's conduct in inducing C not to deal with B may be proper, though it would have been improper if he had not been a competitor. (See § 768). Or, if A is C's business advisor, it is proper for him to advise C, in good faith and within the scope of C's request for advice, that it would be to his financial advantage to break his contract with B, while it would be improper if he were a volunteer. (See § 772). Again, it is important whether the relationship between B and C is that of a prospective contract, an existing contract or a contract terminable at will. (See § 768).

Restatement § 767 cmt. i.

Sangha worked for Navig8 for 6 years.  However, Navig8's interference was not based on any desire to prevent Sangha from working in the industry or as a mooring master.  Navig8 was reasonably trying to protect its economic interest in the *Miss Claudia*.

### III.    Conclusion

In sum the Court finds that while the loss of Sangha's employment was detrimental to Sangha from an economic and personal perspective, Navig8 is not liable for Sangha's termination

and resulting damages.  While Navig8's conduct was intentional, it was not improper under the circumstances.[6]

**DONE** and **ORDERED** this the **24th** day of **July 2020**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[6] Sangha also claimed that Navig8 interfered with prospective and current relations.  The same seven factors outlined in the Restatement Section 767 to determine whether interference was improper as to the current contract apply to interference with prospective relations. And for the same reasons, the Court finds that Navig8 has shown that its actions were not improper under the circumstances. Moreover, there was insufficient evidence that Navig8's conduct has affected Sangha's prospective relations.